# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

DAVID RAMIREZ, 317 East Azalea Ave.,
Tampa, Florida, 33612,

on behalf of himself and all others similarly
situated,

<em>Plaintiff,</em>

v.

THE WASHINGTON TIMES LLC,
3600 New York Avenue, NE, Washington, DC
20002

<em>Defendant.</em>

</td><td>

Civil Action No.

**<u>CLASS ACTION COMPLAINT</u>**

**JURY TRIAL DEMANDED**

</td></tr>
</table>

Plaintiff David Ramirez, individually and on behalf of all other persons similarly situated, makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to allegations specifically pertaining to Plaintiff and Plaintiff's counsel, which are based on personal knowledge.

## I.        NATURE OF THE ACTION

1.        This is a consumer digital privacy class action complaint brought on behalf of all persons who have signed up for a Washington Times account ("Subscribers") and interacted with videos on The Washington Times website www.washingtontimes.com (the "Website"). The Washington Times is an American conservative daily newspaper based in Washington, DC that covers an array of topics, primarily focusing on American politics, commentary, sports coverage, and local DC news. Many of Defendant's articles include pre-recorded videos. The Washington Times is owned and operated by Defendant The Washington Times LLC ("Defendant").

2.      The federal Video Privacy Protection Act ("VPPA") protects consumer privacy by providing for a federal cause of action against "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider", without express consent. 18 U.S.C. § 2710.

3.      Over the past two years, Defendant has systematically transmitted (and continues to transmit today) its Subscribers' personally identifying video viewing information to Piano, a third-party data analytics platform. This unauthorized disclosure occurs through Defendant's deliberate installation and configuration of a specialized code snippet known as the "Piano Tracker" on its Website.

4.      The information Defendant disclosed (and continues to disclose) to Piano via the Piano Tracker includes the Subscribers' email address, the title of the specific prerecorded video material, and the URL of the video that each of its Subscribers accessed on its Website. In the simplest terms, the Piano Tracker installed by Defendant captures and discloses to Piano information that reveals the specific videos that a particular person accessed on Defendant's Website (hereinafter "Private Viewing Information").

5.      Defendant disclosed and continues to disclose its Subscribers' Private Viewing Information to Piano without obtaining their consent to these practices.

6.      The VPPA clearly prohibits what Defendant has done. Subsection (a)(1) of the VPPA provides that "the term 'consumer' means any renter, purchaser, or *subscriber of goods or services* from a video tape service provider." (emphasis added). Subsection (b)(1) of the VPPA provides that, absent the consumer's prior informed, written consent, any "video tape service provider who knowingly discloses, to any person, personally identifiable information ["PII"]

concerning any consumer of such provider shall be liable to the aggrieved person for," 18 U.S.C. § 2710(b)(1), damages in the amount of $2,500.00, *see id.* § 2710(c).

7.      Accordingly, on behalf of himself and the putative Class members defined below, Plaintiff brings this Class Action Complaint against Defendant for intentionally and unlawfully disclosing his Personal Viewing Information to Piano.

## II.      PARTIES

8.      David Ramirez is an individual residing in Tampa, Florida.

9.      Plaintiff has been a subscriber of the Website since approximately February 2025.

10.     Plaintiff, after subscribing to Defendant's Website, has watched prerecorded videos on Defendant's Website during the last six months.

11.     When Plaintiff subscribed to Defendant's Website and viewed prerecorded videos on its Website, Defendant disclosed to Piano Plaintiff's email address coupled with the specific title of the video Plaintiff watched, as well as the URL.

12.     Plaintiff has never consented, agreed, authorized, or otherwise permitted Defendant to disclose Plaintiff's Private Viewing Information to Piano. In fact, Defendant has never even provided Plaintiff with written notice of its practices of disclosing its customers' Private Viewing Information to third parties such as Piano.

13.     Because Defendant disclosed Plaintiff's Private Viewing Information (including Plaintiff's email address, the title of the prerecorded video material Plaintiff watched on Defendant's Website, and the URL of the video) to Piano during the applicable statutory period, Defendant violated Plaintiff's rights under the VPPA and invaded Plaintiff's statutorily conferred interest in keeping such information (which bears on personal affairs and concerns) private.

3

14.     Defendant, The Washington Times LLC is a limited liability company organized under the laws of the State of Delaware with its headquarters and principal place of business at 3600 New York Avenue NE, Washington, D.C. 20002. Defendant The Washington Times LLC owns and operates the Website at issue in this litigation, www.washingtontimes.com.

### III.     JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because it is a civil action arising under a law of the United States: the VPPA, 18 U.S.C. § 2710, *et seq*.

16.     Personal jurisdiction and venue are proper because Defendant maintains its headquarters and principal place of business in Washington DC, within this judicial District.

17.     This Court also has jurisdiction under the Class Action Fairness Act because there is diversity in citizenship between the parties, there are 100 or more class members, and the amount in controversy for the proposed Class (defined below) exceeds $5,000,000, excluding interest and costs. 28 U.S.C. § 1332(d)

### IV.     COMMON FACTUAL ALLEGATIONS

### A.     History And Overview Of The VPPA

18.     The impetus for the VPPA begins with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that history. Congress responded by passing the VPPA, with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and

telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. 100-599, at 5-6

19.     In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

20.     The VPPA prohibits "[a] video tape service provider who knowingly discloses to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

**B.      Defendant Is A Video Tape Service Provider**

21.     Defendant develops, owns, and operates www.washingtontimes.com. The Washington Times is a major news outlet that provides news articles, political commentary, and multimedia content including videos related to current events, politics, and other topics of interest. Video content is a central feature of The Washington Times website and is prominently displayed as its own distinct category.[1]

---

[1] *See* https://www.washingtontimes.com/twt-video/ (last accessed August 5, 2025).

22.    Users can access the Website through various web browsers, including Google Chrome. According to Defendant's own claims, the Website "reaches over 3 million people weekly and 10+ million monthly."[2]

23.    Additionally, to access and watch most videos on The Washington Times website, users must be subscribers; otherwise, access is restricted after limited usage.

24.    Users can access the Website to view videos such as news reports, political commentary, political events, and other video content that accompanies articles posted on the Website.

25.    Defendant also prominently informs users that it provides pre-recorded video content, including through a "Video" option on its Website's main menu:



26.    Upon clicking the "Video" category on Defendant's Website, users can view an assortment of pre-recorded videos, covering a wide range of news and political commentary on current events topics.

**C.    Defendant Knowingly Discloses Its Users' Personally Identifiable Information With A Third Party**

---

[2]  *See* https://media.washtimes.com/media/misc/2018/09/27/WTMediaKit_Final.pdf  (last accessed August 5, 2025).

(i)      **Background to the Piano Tracker**

27.      Piano is a data analytics and marketing platform designed to help digital publishers, media companies, and content providers track user behavior, personalize content, and optimize their business strategies. It provides tools for managing subscriptions, paywalls, user authentication, and targeted advertising. "Piano's Digital Experience Platform empowers organizations to understand and influence customer behavior. By unifying customer data, analyzing behavior metrics and creating personalized customer journeys, Piano helps brands launch campaigns and products faster, strengthen customer engagement and drive personalization at scale from a single platform."[3] These services allow Piano's customers such as Defendant to analyze Website user data and provide targeted advertisements.

28.      To access these services provided by Piano, websites like The Washington Times install the Piano Tracker on their website. The tracker is implemented when Defendant integrates the Piano "application programming interface" ("API") into the Website, either as part of a Piano Software Development Kit ("SDK") or as a standalone API. The integration of the Piano software into a website is what is referred to as the Piano Tracker and establishes the data collection pipeline between Defendant's website and Piano.

29.      An API "acts an intermediary layer that processes data transfer between systems, letting companies open their application data and functionality to external third-party developers [and] business partners."[4] An API can "work [] as a standalone solution or included within an SDK … [A]n SDK often contains at least one API."[5]

---

[3] *See* https://www.linkedin.com/company/piano-io/about/ (last accessed August 5, 2025).
[4] IBM, *What is an API?*, available https://www.ibm.com/topics/api.
[5] SDK VS. API: WHAT'S THE DIFFERENCE?, IBM (July 13, 2011), https://www.ibm.com/blog/sdk-vs-api/ ("SDK" stands for software development kit and "is a set of software-building tools for a specific program," while "API" stands for application programming interface).

30.    Once installed, Piano's tracker monitors and collects user activity data on the website it is installed in and sends this data to Piano. This includes information such as what videos/articles a user views; how long they engage with content; user demographics and behavior patterns; and PII, such as email addresses.

**(ii)    Defendant Used the Piano Tracker to Send Digital Subscriber's Personal Viewing Information to Piano**

31.    Defendant installed the Piano Tracker on its Website and on the individual pages on its Website.

32.    Defendant configured the Piano Tracker on the Website to send specific data to Piano. Specifically, when a user creates an account on The Washington Times and watches a pre-recorded video on the Website, Defendant, in the same communication, discloses the following information to Piano: the user's email address, the name of the video watched by the user and the video URL. The transmitted data permits Piano to identify the specific videos that an individual has watched.

**(iii)    Defendant Discloses Users' Email Addresses to Piano**

33.    An email address is a unique string of characters that designates an electronic mailbox.

34.    An ordinary person can use an email address to uniquely identify another individual. Many email addresses directly reveal the owner's name in the address itself. Even when an email address does not contain the owner's name, numerous online services exist that allow anyone with internet access and a credit card to determine the particular identity of the email address owner.

35.    When a user watches a video, Defendant discloses to Piano through the Piano Tracker a user's email address.

36.     Defendant discloses users' email addresses to Piano in Base64 encoding, which Defendant designates as a "user_token." Base64 is not a secure encryption method but merely an encoding scheme that can be readily decoded by anyone. Numerous free online resources enable any Internet user to instantly convert Base64-encoded text into its original readable format.

37.     The following excerpt illustrates a screenshot of the "user_token" containing a user's Base64-encoded email address, which is transmitted to Piano by Defendant whenever a subscriber accesses video content on Defendant's website.



38.     The second screenshot demonstrates how easily the "user_token" can be decoded using freely available online tools. As shown in the image below, these publicly accessible decoding resources expose users' personal email addresses without requiring any specialized technical knowledge or skills.



39.    The left box in the screenshot above, titled "Encoded Value," has been filled with the "user_token" text — the Base64-encoded field Defendant transmitted to Piano. The bottom right box in the screenshot above, labelled "Decoded Payload", is populated with legible text that the freely available tool decrypted.

40.    Notably, the user's email address is clearly displayed in the decrypted text populated inside the bottom box, demonstrating how easily the supposedly protected information can be accessed. (The full email address has been redacted in the image to protect the user's privacy.)

**(iv)    Defendant Discloses To Piano Information Identifying Which Specific Videos Were Watched By Which Users**

41.    Defendant discloses to Piano through the Piano Tracker the full title of videos that users watch along with the corresponding Universal Resource Locator ("URL") for each video. The screenshot on the following page (also provided in larger format in Appendix 1 to this complaint) captures Defendant's communication with Piano, revealing in a single transmission: (1) the complete title of the video watched: "WATCH: How technology is changing the way war is waged in the Mideast and beyond"; (2) the video's full URL: https://www.washingtontimes.com/news/2025/feb/27/threat-status-idex-technology-changing-way-war-waged-mideast-beyond/; and (3) the User Token containing the user's email address (as demonstrated previously).



42.      A video's title serves as the most basic identifier of that video content and explicitly reveals the subject matter watched by the user. Additionally, the video's URL functions as a direct access point, allowing anyone who enters that URL into an internet browser to access the identical video content viewed by the user. Together, these disclosures provide Piano with precise information about the specific video materials consumed by identifiable individuals.

43.      This comprehensive disclosure enables Piano to identify the specific video content accessed by users and to link that viewing activity directly to individually identifiable persons through their email addresses. By transmitting both viewing data and personal identifiers in a single communication, Defendant facilitates Piano's ability to create detailed profiles of users' viewing habits.

**D.  Defendant Discloses Personally Identifiable Information To Piano For The Purposes Of Marketing, Advertising, And Analytics**

44.      Defendant transmits a user's email address, video name, and video URL to Piano so that Piano can analyze user behavior. Through Piano's analysis results, Defendant can target different users with different marketing and advertising strategies and thereby increase its user base.

11

45.     Piano's suite of technological tools provides services to customers like Defendant that "[f]uel the commerce side of your digital business;" "[a]mplify your brand impact;" and use [r]eal-time data, [and] real-time segmentation" in analytics processes to "[d]eliver personalized experiences" and "[c]ontrol [users'] premium content access," among other marketing, analytics, and advertising initiatives.

46.     One example of a tool Piano offers its customers, like Defendant, is the "Piano VX." VX "is [Piano's] most powerful commerce engine that creates real-time value." This tool delivers "[t]he numbers [Defendant] need[s]" to improve its marketing, analytics, and advertising capabilities.

47.     Accordingly, by using Piano's suite of technological tools, including VX, Defendant is able to have "[e]verything [it] know[s] about a user immediately available for segmentation and targeting."

48.     Piano's Chief Executive, Trevor Kaufman, stated, "[d]igital media businesses are increasingly focused on monetizing their loyal users." Piano's creation provided "publishers and media companies [such as Defendant] with the most effective and usable monetization and analytics tools available."

49.     Piano also offers "advanced data and CRM capabilities to help content companies identify and segment their audience, enabling business models targeted to the individual user. Piano's platform integrates easily alongside existing advertising solutions, allowing clients to optimize their mix of paid and ad-supported media."

50.     Piano's senior advisor and Board member, Kelly Leach, stated that "[a]udience intelligence and optimization are critical elements of content monetization. By [the Piano and Tinypass merge] … the combined company is able to offer media companies the most

comprehensive, effective [,] and user-friendly platform in the industry." And Defendant knows how to take commercial advantage of this.

**E.  Defendant Knowingly Discloses Users' Personally Identifiable Information To Piano**

51.    Defendant's practices of disclosing the Private Viewing Information of its subscribers to Piano continued unabated for the duration of the two-year period preceding the filing of this action. At all times relevant hereto, whenever Plaintiff or any other person watched prerecorded video material from Defendant on its Website, Defendant disclosed to Piano the specific title of the video material that was watched (including the URL of the material), along with the personal email of the person who watched it (which, as discussed above, uniquely identified the person).

52.    At all times relevant hereto, Defendant knowingly and deliberately deployed the Piano Tracker on its website with full awareness that this technology was systematically transmitting subscribers' Private Viewing Information to Piano.

53.    Defendant did not obtain prior written consent from its digital subscribers before disclosing their Personal Viewing Information to Piano. As a result, The Washington Times's subscribers remained unaware that their Personal Viewing Information and other sensitive data was being shared with Piano.

54.    By intentionally disclosing to Piano the Plaintiff's and its other subscribers' personal email addresses together with the specific video material that they watched, without obtaining their consent to these practices, Defendant knowingly violated the VPPA.

**F.    Defendant has no justification for sharing user's Personal Viewing Information with Piano**

***(i)    Disclosing Personal Viewing Information is not necessary***

55.     While websites might find it beneficial to integrate the Piano Tracker, Defendant does not need to use the Piano Tracker to operate its Website or manage its subscriptions. The Piano Tracker is used on the Website for the sole purpose of enriching Defendant and Piano.

56.     Notably, Defendant could easily ensure compliance with the VPPA and relevant state laws by simply removing the Piano Tracker from webpages containing videos—a straightforward solution that Defendant has deliberately chosen not to implement. This decision underscores that Defendant's disclosure of Personal Viewing Information to Piano is not only unnecessary for website functionality but represents a conscious choice to prioritize commercial interests over legal compliance.

*(ii)*     **The Website's privacy policy fails to obtain proper consent from subscribers**

57.     The Washington Times fails to comply with the VPPA by neglecting to properly notify users and obtain their written consent before collecting their private viewing information. The VPPA mandates that such consent be written and must be obtained through a form that is "distinct and separate from any form setting forth other legal or financial obligations of the consumer." Defendant does not adhere to this requirement.

58.     While Defendant's privacy policy, as linked on The Washington Times website, states that The Washington Times incorporates third-party partners or service providers, including pixels, to display advertisements on its webpages, it fails to disclose its specific use of the Piano Tracker.[6] In fact, while The Washington Times references multiple trackers it has installed on its site including *inter alia* DoubleClick, LiveRamp and Nativo it makes no reference whatsoever to Piano.

---

[6] *See* https://www.washingtontimes.com/privacy/ (last accessed March 23, 2025).

59.     Moreover, Defendant's privacy policy makes no mention whatsoever that The Washington Times transmits subscribers' private viewing information alongside their email addresses to Piano. This significant omission prevents users from understanding that their video viewing history is being linked directly to their personal identifiers and shared with third parties.

60.     Defendant's disclosures regarding the scope of its use of subscribers' email addresses are particularly misleading. In its privacy policy, The Washington Times states:

> **_Your Email Address_**
> In addition, we may use your email address to contact you for customer service purposes, to inform you of important changes or additions to our site or the services offered over our site, to send you administrative notices and other information about our site, and to tell you about other products or services offered by TWT, or other companies, that we think may be of interest to you. If you subscribe to any of our newsletters, we'll use your email address to send the newsletters to you. Although we hope you'll find these communications informative and useful, if you don't, you can always unsubscribe to either type of message by following the simple instructions included in each email.[7]

61.     This statement entirely omits Defendant's practice of sharing users' email addresses with Piano. Defendant also fails to disclose that along with users' emails it shares subscribers' private, protected, and personally identifiable viewing information with Piano, enabling the connection of viewing habits directly to users' personal email accounts.

62.     Most critically, Defendant's failure to obtain written consent from Washington Times subscribers before disclosing their viewing information and email addresses to Piano constitutes a clear and direct violation of the VPPA's explicit consent requirements.

**G.     Plaintiff's Experience**

63.     David Ramirez is a resident of Tampa, FL.

---

[7] _See_ https://www.washingtontimes.com/privacy/ (last accessed August 5, 2025).

64.     Plaintiff created an account on the Website in approximately February 2025. Since that time, Plaintiff has watched numerous pre-recorded videos on the Website while signed into Plaintiff's account.

65.     Though the account was free of charge, Plaintiff was required to provide Defendant with Plaintiff's email address as part of the sign-up process.

66.     At all times relevant, Plaintiff never consented, agreed, nor otherwise permitted the Website to disclose Plaintiff's PII to third parties.

67.     Likewise, Defendant never gave Plaintiff the opportunity to prevent the Website from disclosing Plaintiff's PII to third parties.

68.     Nevertheless, each time Plaintiff viewed a pre-recorded video on the Website, Defendant disclosed Plaintiff's PII to Piano via the Piano Tracker. Specifically, Defendant disclosed Plaintiff's personal email address, and the title and URL of the video Plaintiff watched.

69.     Using this information, Piano was able to identify Plaintiff and attribute Plaintiff's video viewing records to an individualized profile of Plaintiff. Indeed, even an ordinary person could identify Plaintiff using the data Defendant disclosed to Piano. Piano compiled Plaintiff's PII and activity on the Website (including video-viewing information), which Defendant used and continues to use for marketing, advertising, and analytics purposes.

## V.    CLASS ALLEGATIONS

70.     Plaintiff brings this action on behalf of himself and all others similarly situated as a class action on behalf of the following class (the "Class"):

All persons in the United States who created an account on The Washington Times Website, watched a pre-recorded video on the Website while signed into their Washington Times account, and had their PII transmitted to Piano.

71.     *Numerosity*: At this time, Plaintiff does not know the exact number of members of the aforementioned Class. However, given the popularity of Defendant's Website, the number of persons within the Class is believed to be *so numerous that joinder of all members is impractical.*

72.     *Commonality* and Predominance: There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include: (a) whether Defendant collected Plaintiff's and Class Members' PII; (b) whether Defendant unlawfully disclosed and continues to disclose its users' PII, including their video viewing records, in violation of the VPPA; (c) whether Defendant's disclosures were committed knowingly; and (d) whether Defendant disclosed Plaintiff's and Class Members' PII without consent.

73.     *Typicality*: Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, used the Website to watch videos, and had his PII collected and disclosed by Defendant.

74.     *Adequacy*: Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and its state-inspired offspring. Plaintiff and his counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class. Neither Plaintiff nor his counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Class. Plaintiff has raised viable statutory claims, of the type reasonably expected to be raised by members of the Class and will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class,

17

additional claims as may be appropriate, or to amend the definition of the Class to address any steps that Defendant took.

75.     *Superiority*: A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Even if every member of the Class could afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class. Plaintiff anticipates no difficulty in the management of this action as a class action.

## VI.     CAUSE OF ACTION
### Violation of the Video Privacy Protection Act 18 U.S.C. § 2710, et seq.

76.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

77.     Plaintiff brings this claim individually and on behalf of the Class against Defendant.

78.     Defendant is a "video tape service provider" as defined by the VPPA because it "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," inasmuch as it provides video (i.e., "similar audio visual materials" under the VPPA's definition) to consumers via its Website. 18 U.S.C. § 2710(a)(4).

79.     Plaintiff and Class Members are "consumers" as defined by the VPPA because they created an account with Defendant and thus "provide[d] consideration in the form of" personal

information, and otherwise established a "commitment, relationship, or association" with Defendant. *Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482, 488-89 (1st Cir. 2016) (cleaned up). Under the VPPA, therefore, Plaintiff and Class Members are "subscribers" of "goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1).

80.     Plaintiff and Class Members viewed pre-recorded videos on the Website while signed into their Washington Times accounts. During these occasions, Defendant disclosed Plaintiff's and Class Members' PII to Piano, a third party. Specifically, Defendant disclosed Plaintiff's and Class Members: (i) email addresses, (ii) the title of the videos Plaintiff and Class Members watched (iii) and URL of the videos Plaintiff and Class Members watched.

81.     The information disclosed by Defendant constitutes "personally identifiable information" because it identifies the Plaintiff and each Class member to Piano as an individual who watched videos on The Washington Times, including the specific video materials requested from the Website. 18 U.S.C. §2710(a)(3). Indeed, the information disclosed by Defendant to Piano enables even an ordinary person to identify which specific videos were watched by Plaintiff or specific Class Members.

82.     Defendant's disclosures of Plaintiff's and Class Members' PII to Piano constitute "knowing [] disclosures" of Plaintiff's and Class Members' "personally identifiable information" to a person as proscribed by the VPPA. 18 U.S.C. § 2710(a)(1).

83.     Plaintiff and Class Members did not provide Defendant with any form of consent— either written or otherwise—to disclose their PII to third parties.

84.     Nor were Defendant's disclosures made in the "ordinary course of business" as that term is defined by the VPPA. In particular, the Website's disclosures to Piano were not necessary

for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

85.     On behalf of themselves and the Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## VII.    PRAYER FOR RELIEF

86.     Accordingly, Plaintiff, on behalf of himself and the proposed Class, respectfully requests that this Court grant judgment against the Defendant as follows:

a) an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class

b) an order declaring that Defendant's conduct violates the VPPA, under 18 U.S.C. § 2710(c)(2)(D);

c) liquidated damages of $2,500 to the Plaintiff and each Class member, under 18 U.S.C. § 2710(c)(2)(A);

d) punitive damages, as warranted, in an amount to be determined at trial, under 18 U.S.C. § 2710(c)(2)(B);

e) prejudgment interest on all amounts awarded;

f) an order of restitution and all other forms of equitable monetary relief;

g) injunctive relief as pleaded or as the Court may deem proper; and

h) an order awarding Plaintiff and the Class their reasonable attorneys' fees

and expenses and costs of suit, under 18 U.S.C. § 2710(c)(2)(C).

## VIII.   JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

DATED: August 11, 2025                    Respectfully Submitted,


/s/ Stan M. Doerrer
Stan M. Doerrer (DC Bar # 502496)
**LAW OFFICE OF
STAN M. DOERRER PLLC**
950 N. Washington Street
Alexandria, VA. 22314
Tel: 703-348-4646
Fax: 703-348-0048
stan@doerrerlaw.com

Katrina Carroll, Esq.*
**CARROLL SHAMBERG LLC**
111 West Washington Street
Suite 1240
Chicago, IL 60602
Office: 872-215-6205
Mobile: 847-848-1384
katrina@csclassactions.com

*Pro Hac Vice* Application
Forthcoming

*Counsel for Plaintiff*